UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PARS ICE CREAM COMPANY, INC,
and PARS ICE CREAM CALIFORNIA, INC.,

    Plaintiffs,

v.                                                                              Case No. 12-15598

CONOPCO, INC d/b/a/ UNILEVER ICE CREAM,

                                                                    HON. AVERN COHN

    Defendant.
_____/

**MEMORANDUM AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS
<u>PLAINTIFFS' FIRST AMENDED COMPLAINT (Doc. 18)</u>** [1]

**I. INTRODUCTION**

This is a contract case. Plaintiffs Pars Ice Cream Company, Inc. ("Pars MI") and Pars Ice Cream Company California, Inc. ("Pars CA") (collectively, the "Pars entities"), wholesale distributors of ice cream, are suing defendant Conopco, Inc. d/b/a/ Unilever ("Unilever"), an ice cream manufacturer, claiming that Unilever breached the terms of two wholesale distributor agreements. The first amended complaint is in twelve counts, phrased by the Pars entities as follows:

    Count I       Breach of Contract (failure to supply goods)

    Count II      Breach of Contract (violation of exclusivity provision)

---

[1] Upon review of the papers, the Court deems this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

| | |
|---|---|
| Count III | Breach of Contract (improper imposition of freezer rental fees) |
| Count IV | Breach of Contract (improper imposition of lost/missing freezer fees) |
| Count V | Breach of Contract (refusal to recognize proper rebates and other deductions) |
| Count VI | Tortious Interference With Business Relations and/or Tortious Interference With Business Opportunities and Advantages |
| Count VII | Declaratory Judgment |
| Count VIII | Declaratory Judgment (improper imposition of fees for loss/missing freezers) |
| Count IX | Breach of Contract (failure to supply goods) |
| Count X | Breach of Contract (violation of exclusivity provision) |
| Count XI | Tortious Interference With Business Relations and/or Tortious Interference With Business Opportunities and Advantages |
| Count XII | Breach of Contract (breach of freezer agreement) |

This case was filed on December 20, 2012 (Doc. 1). On February 19, 2013, Unilever filed a motion to dismiss the complaint (Doc. 13). The complaint was amended on March 11, 2013 (Doc. 16). Now before the Court is Unilever's motion to dismiss the Pars entities' first amended complaint (Doc. 18). The motion is DENIED. The reasons follow.

## II. BACKGROUND

The Pars entities filed a forty-three page, 226 paragraph first amended complaint (Doc. 16). The scenario that follows is taken from the first amended complaint, the allegations of which are accepted as true. *See Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 923 (6th Cir. 2013) (citing *Handy–Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 535 (6th Cir. 2012) ("Because we are reviewing the district court's order of dismissal under Fed.

R. Civ. P. 12(b)(6), we must accept as true the facts set out in the complaint.")).

## A. The Parties

Pars MI and Pars CA are wholesale distributors of ice cream. Pars MI is a Michigan corporation with its principal place of business in Michigan. It distributes ice cream in the State of Michigan. Pars CA is a Michigan corporation with its principal place of business in California. It distributes ice cream in the State of California. Unilever is an ice cream manufacturer incorporated in New York with its principal place of business in Wisconsin.

## B. The Distributorship Agreements

Pars MI has conducted business with Unilever for over 20 years. For many years, prior to doing business with Unilever, Pars MI bought ice cream from multiple manufacturers including Nestle, Wells' Dairy, M&M Mars, *etc.* However, Unilever pushed for Pars MI to cut ties with the other manufacturers and become Unilever's exclusive distributor.

### 1. The 2004 Freezer Agreement

On April 20, 2004, Pars MI and Unilever entered into a Distributor Freezer Program Agreement (the "Freezer Program"). The Freezer Program provided terms and conditions for Unilever to provide Pars MI display and storage freezers, pushcarts and other freezer equipment "to be placed in [Pars MI's] retail accounts for merchandising and displaying ice cream and other frozen dessert products." Among the terms and conditions of the Freezer Program were the following:

* Unilever required freezer equipment to be placed in stores with accounts having the potential to generate the highest sales volume;

* Unilever imposed an annual equipment rental fee;

3

* Unilever restricted Pars MI from placing any products not manufactured by Unilever in the freezer equipment;

* Pars MI was not allowed to participate in a freezer equipment program with any third party; and

* Pars MI was required to maintain adequate inventory and stock and distribute products deemed necessary by Unilever.

**2. The 2005 Preferred Distributor Agreement**

On October 1, 2005, Pars MI and Unilever entered into a Preferred Distributor Agreement (the "Michigan agreement") that provided for Pars MI to serve as the preferred distributor of Unilver's "Out-Of-Home" sales division until December 31, 2010. The Michigan agreement was amended on November 27, 2006 to give Pars MI exclusive rights to distribute Unilever products throughout the entire Out-Of-Home market. Further, the term of the agreement was extended until December 31, 2012.

The Michigan agreement provided for specific products that Pars MI would have exclusive distribution rights to and also defined the "Michigan territory" that Pars MI would distribute to exclusively. In exchange for exclusivity rights in the defined territory, Pars MI was required to use its "best efforts to promote, distribute and sell the products and to exploit the market potential for the products in the territory." In addition, Pars MI was restricted in the amount of non-Unilever products that it could sell–products manufactured by third parties other than Unilever could not exceed 40% of Pars MI's total sales. Finally, Pars MI was not allowed to sell Unilever's products outside of the defined territory. To carry out the terms of the Michigan agreement, Unilever was required to supply Pars MI with sufficient inventory.

The Michigan agreement "incorporated Unilever's standard terms and conditions of

4

sale and distribution, handling, credit, and other policies and set forth important rights granted to Pars Michigan and other distributors relating to such issues as order lead times, credit terms, pricing notification and other specific operating principles." The Michigan agreement also included a right of refusal–Pars MI reserved the right to refuse to sell to any sub-distributor who did not comply with the terms and conditions of the Michigan agreement. Finally, the Michigan agreement applied to all products sold through the 2004 Freezer Program.

### 3. The 2007 Preferred Distributor Agreement

On April 27, 2007, Pars CA entered into a similar distributor agreement with Unilever giving Pars CA exclusive distributor rights to Unilever's products in the southern part of the State of California until December 31, 2012 (the "California agreement"). "Like the Michigan Agreement, Pars California was contractually obligated to attain certain performance goals or risk having to make penalty payments to Unilever and/or termination by Unilever." The California agreement contained the same terms and conditions as the Michigan agreement.

## C. Unilever's Contract with Arya Ice Cream

Prior to entering into the California agreement, Unilever entered into an exclusive distributor contract with Arya Ice Cream in California that was set to expire on December 31, 2008 (the "Arya contract"). Unilever terminated the Arya contract on October 5, 2007, effective as of December 31, 2007. Pars CA then became Unilever's exclusive distributor pursuant to the California agreement.

On December 10, 2007, Arya sued Unilever in California state court for breach of contract and interference with prospective economic advantage. In that action, Arya

contested Pars CA's status as Unilever's exclusive distributer in southern California. After Arya threatened Pars CA with suit for tortious interference with its contract with Unilever, Pars CA sought to have Unilever delay the effective date of the California agreement until January 1, 2009; Unilever did not agree.

**D. Problems in Michigan**

In November of 2007, "Unilever began engaging in a pattern and practice of breaching its contractual obligations." Unilever permanently closed its Green Bay, WI facility which served as the North American headquarters and retained only a handful of its employees.

At some point during its contractual relationship with Unilever, Pars MI agreed to allow Unilever to sell ice cream to Pars MI's competitors, Prairie Farms and Bareman Dairy. The agreement required Unilever to credit Pars MI with a 16% rebate on amounts due under the Michigan agreement. After a dispute arose as to the amount Pars MI was to be reimbursed, however, Pars MI informed Unilever that it was no longer authorized to sell directly to Prairie Farms, Bareman Dairy, or any of Pars MI's other competitors.

On November 13, 2007, Unilever sent Pars MI a letter stating that it had the right to sell directly to Prairie Farms and Bareman Dairy in the Michigan territory notwithstanding the Michigan agreement. Ever since the November 13 letter, Unilever sold ice cream to Prairie Farms and Bareman Dairy. Unilever also sold ice cream directly to Pars MI's sub-distributors. In addition, Unilever allowed Prairie Farms and Bareman Dairy to sell directly to national chain accounts even though such sales were reserved for Pars MI in the Michigan agreement. Pars MI voiced its objections to what it believed to be violations of the Michigan agreement.

Through its actions, Pars MI says that "Unilever substantially undercut Pars Michigan's business in the competitive marketplace by injuring its business relationship with sub-distributors and customers, and by bolstering its competitors in its exclusive territories."

**E. Problems in California**

Shortly after the parties entered into the California agreement Pars CA began experiencing problems with Unilever.

In early 2008, Unilever sales staff ordered $2 million dollars of product, placed it in cold storage, and informed Pars CA that it would sell it to Pars CA on a consignment basis. Pars CA did not order the ice cream and objected to paying for products it did not order or use.

In addition, Arya "engaged in a massive competitive battle with Pars California whereby Arya continued to sell Unilever products in 2008 that it had stockpiled in 2007 prior to its termination as the exclusive distributor for Unilever."

The ongoing litigation between Unilever and Arya strained the relationship between Pars CA and Unilever. During this time, Pars MI also objected to Unilever allowing Prairie Farms and Bareman Dairy to sell ice cream in Pars MI's exclusive Michigan territory.

The parties came to an impasse during the summer of 2008. Unilever and Pars CA disputed amounts that were due to Unilever under the California agreement. Unilever asserted that Pars CA owed it $1.8 million for past due invoices and $300,000.00 for past due freezer rent fees. Pars CA disputed the amounts as inaccurate. Eventually, Pars CA filed suit against Unilever in California state court.

**F. Unilever Refuses to Ship Ice Cream**

In August of 2008, because of the dispute over past due amounts by Pars CA,

Unilver refused to ship ice cream to Pars CA, Pars MI and nonparty Pars Chicago, who had a similar distributor contract with Unilever in the Chicago area. Unilever told the Pars entities that it would not release any future orders unless Pars CA dismissed the California lawsuit, despite plaintiffs offering to pay all future orders on a cash on delivery ("C.O.D.") basis.

### G. Pars MI Sues Unilever

On August 15, 2008, Pars MI sued Unilever in this Court for breach of contract. Pars MI's suit was premised on Unilever's failure to deliver ice cream under the Michigan agreement. As explained above, Unilever stopped shipping ice cream to all of the Pars entities after it claimed that Pars CA owed it money for past due invoices and freezer rents. On August 27, 2008, the parties settled their dispute. The settlement required Pars CA to make structured payments of $1.4 million dollars over a ten week period. The payments represented the amount due under the disputed invoices. Unilever agreed to forgo any amount for freezer rental amounts as part of the settlement. The settlement agreement also required Unilever to honor and fill all purchase orders made by Pars MI.

By early 2009, Pars CA paid the entire settlement amount.

### H. Unilever Again Stops Shipment to Pars MI

In February of 2009, almost immediately after receiving the final settlement payment from Pars CA, Unilever stopped shipping ice cream to Pars MI and asserted that Pars CA owed it $215,000.00 in past due invoices. Unilever also disputed deductions taken by Pars CA for freezer rental. Pars MI wrote to Unilever and asked that Unilever immediately resume shipping ice cream and offered to pay for the ice cream on a C.O.D. basis. Unilever refused.

Because Unilever refused to ship the ice cream ordered by Pars MI, it could not fill its customers' orders. This harmed its relationship with its sub-distributors. Indeed, "Pars Michigan experienced a few million dollar decline in the volume of Unilever products that it was allowed to purchase between 2008 and 2009, and further lost substantial income on truck rent from the street vending business." Pars MI's sub-distributors began to obtain Unilever ice cream from other sources because of Pars MI's inability to supply them.

**I. Pars MI sues Unilever for a Second Time**

On February 24, 2009, Pars MI again sued Unilever in this Court seeking to enjoin it from breaching the parties' Michigan agreement. Three days later, on February 27, 2009, the parties settled the dispute. Under the settlement agreement, Pars CA agreed to make structured payments for the past due invoices. The parties agreed to work in good faith to reach final conclusion regarding the freezer rent issues. The settlement amount was promptly paid by Pars CA. The parties never agreed on the disputed freezer rent issue.

**J. Problems Continue After 2009 Settlement**

After settling the second lawsuit in February of 2009, Pars MI again suffered product shortages due to Unilever's refusal to fill orders. In addition, after the 2009 settlement agreement, Unilever continued to sell ice cream to distributors in the Michigan territory in violation of the Michigan agreement. Although Unilever occasionally wrote cease and desist letters to ice cream distributors selling in the Michigan territory, "Unilever nevertheless continued to knowingly allow these unauthorized sales . . . to occur." Unilever sold directly to Pars MI's biggest sub-distributor, Dean Foods/Country Fresh, among others.

Pars MI "repeatedly and consistently objected to Unilever's numerous and consistent

breaches of the exclusivity provisions of the Michigan Agreement." It also "supplied Unilever with documented proof that unauthorized direct sales have occurred and that unauthorized sales of [p]roduct has occurred in the restricted territory." However, Unilever "refused to take any commercially reasonable action to prevent these unauthorized sales."

Pars CA continued to suffer from the same problems as Pars MI at the same time. Beginning in 2008, Pars CA "suffered substantial damages as a result of Unilever's failure to take adequate and reasonable measures to protect Pars California's exclusivity rights." As late as 2009, Arya continued to sell Unilever products in Pars CA's exclusive territory in violation of the California agreement.

Further, Unilever "unilaterally initiated unusual and unprecedented price increases of key vending items in 2008. These unusual price increases further damaged Pars California of its ability to compete with its competitors." To make matters worse, beginning in 2008, Unilever systematically sold ice cream to third-party distributors, including Arya, in the restricted territory defined in the California agreement.

In 2009, Unilever provided Pars MI with defective freezer cabinets. Pars MI's goods were damaged when the freezer breakdowns occurred. In March of 2009, there was a safety recall on the freezers. However, Unilever refused to pay for repaired costs, improperly charged freezer rent, and did not compensate Pars MI for damaged goods.

Beginning in 2011, "Unilever embarked upon a scheme to purposefully 'short' and deprive Pars Michigan and Pars California of 'key' novelty ice cream products critical to the Out-Of-Home and mobile vending markets." Around the same time, Unilever for the first time claimed that the Pars entities owed more than half a million dollars for "lost/missing" freezers. Unilever cited the freezer issue as a reason to cease shipments of ice cream to

Pars CA and Pars MI. Unilever's actions in shorting the Pars entities in ice cream continued throughout 2011 and 2012. By May 29, 2012, Unilever stopped shipping ice cream to the Pars entities.

In May of 2012, Unilever imposed a total credit limit of $1 million dollars covering the Pars entities' Michigan, Phoenix and California operations. This was done before the August "peak season." The credit limit was inadequate to meet the Pars entities' volume demands. Unilever relied on the credit limit to refuse to ship ice cream to the Pars entities. According to Pars MI, "Unilever's action of imposing an artificially low credit limit is directly inconsistent with the parties' course of dealing over many years, and was implemented in bad faith and was not commercially reasonable."

### III. LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint. To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir. 2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

## IV. DISCUSSION

Unilever says that the Pars entities have not sufficiently alleged any of the breach of contract claims in the first amended complaint based on Unilever's failure to supply product or imposition of freezer rental fees. Unilever also argues that it did not refuse to pay Pars MI any required rebates. Likewise, Unliever contends that the Pars entities have not sufficiently alleged a claim of tortious interference. Next, Unilever says that the Pars entities have not pleaded their own performance under the contracts and that their claims before December 20, 2011 are time-barred. Finally, Unilever says that the Pars entities are not entitled to a declaratory judgment.

**A. The Breach of Contract Claims**; **Counts I, II, III, IV, V, IX, X, and XII**

Under New York[2] law, the essential elements to prove a breach of contract are: (1) "the existence of a contract"; (2) "the plaintiff's performance under the contract"; (3) "the defendant's breach of that contract"; and (4) "resulting damages." *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803 (N.Y. App. Div. 2010) (citing *Agway, Inc. v. Curtin*, 161 A.D.2d 1040, 1041 (N.Y. App. Div. 1990); *Furia v. Furia*, 116 A.D.2d 694, 695 (N.Y. App. Div. 1986)).

---

[2] The parties agree that the distributor agreements in question are governed by a New York choice-of-law provision.

The first amended complaint alleges in sufficient detail that Unilever failed to supply the Pars entities with ice cream product, improperly imposed freezer rental fees, did not properly recognize rebates, and did not abide by the exclusivity provisions in the distributor agreements. The Pars entities' well-plead factual allegations give rise to a plausible entitlement to relief; the breach of contract claims will not be dismissed.

Unilever says that, to the extent that the Pars entities' claims are based on events that occurred prior to December 20, 2011, they should be dismissed. Unilever contends that both the Michigan and California agreements incorporate a standard Unilever term and condition limiting claims arising out of the agreements to be brought within one year.

The parties agree that Unilever's "Standard Terms and Conditions" apply to the agreements. One of those standard terms and conditions, according to Unilever, is that claims arising out of the agreements must be brought within one year. The Pars entities dispute that this provision is incorporated in the agreements.

The disputed one-year limitation requires further fact development and it is not a basis for granting Unilever's motion to dismiss. The Pars entities are entitled to discovery to determine whether the one-year limitation applies to the agreements in question.

**B. The Tortious Interference Claims; Counts VI and XI**

New York law provides a cause of action for tortious interference with business relations. The elements are: "(a) business relations with a third party; (b) the defendant's interference with those business relations; (c) the defendant acting with the sole purpose of harming the plaintiff or using wrongful means; and (d) injury to the business relationship." *Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc.*, 15 Misc.3d 776 (N.Y. Sup. Ct. 2007), *aff'd* 44 A.D.3d 317 (N.Y. App. Div. 2007) (citations omitted).

13

As described above, the first amended complaint details actions taken by Unilever to interfere with the Pars entities' relationship with its sub-distributors. For example, the Pars entities claim that Unilever sold directly to their sub-distributors. In addition, the Pars entities say that, by selling to third party distributors in the exclusive territory, while at the same time under-supplying product and raising the price of product sold to the Pars entities, Unilever intentionally interfered with its business relations. The first amended complaint sufficiently states a claim of tortious interference with business relations.

**C. Declaratory Judgment Claims; Counts VII and VIII**

Pars MI seeks a declaratory judgment as to the total amount of freezer rent, if any, due to Unilever. Pars MI also seeks a declaratory judgment regarding Unilever's claim to costs associated with 781 lost/missing freezers.

District courts have discretion in determining whether to exercise jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). *Bituminous Cas. Co. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004). As the Sixth Circuit has explained, courts are to consider five factors to determine whether a declaratory judgment is appropriate:

> (1) whether the judgment would settle the controversy;
>
> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;
>
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
>
> (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
>
> (5) whether there is an alternative remedy that is better or more effective.

14

*Id.* at 813.

Weighing the factors above, the declaratory judgment claims in the first amended complaint are adequately stated and will not be dismissed. Pars MI has sufficiently pleaded the existence of a ripe dispute and a judgment will settle the controversy.

## V. CONCLUSION

For the reasons stated above, Unilever's motion to dismiss the first amended complaint was denied. Unilever shall file an answer to the first amended complaint within fourteen days of entry of this order.

SO ORDERED.

                                                S/Avern Cohn
                                                AVERN COHN
                                                UNITED STATES DISTRICT JUDGE

Dated: July 25, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 25, 2013, by electronic and/or ordinary mail.

                                                S/Sakne Chami
                                                Case Manager, (313) 234-5160