UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PARS ICE CREAM COMPANY, INC.,
a Michigan corporation, and
PARS ICE CREAM CALIFORNIA, INC.,
a Michigan corporation,

    Plaintiffs,

-vs-                                      Case No. 12-15598
                                         HON. AVERN COHN

CONOPCO, INC., d/b/a UNILEVER,

    Defendant/Counter-Plaintiff,

-vs-

DAVOUD SADEGHI, SHELLEY
TRAYWICK, PARS ICE CREAM
COMPANY, INC., and PARS ICE
CREAM CALIFORNIA, INC.,

    Counter-Defendants.

_____/

**DECISION**

**TABLE OF CONTENTS**

Page

I. Introduction

    A. Nature of Dispute and Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. Prior Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    C. Prior Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. The Claims

    A. Pars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. Unilever Counter-claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C. New York Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D. Observation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. Trial

    A. Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B. Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV. Findings of Fact and Conclusions of Law

    A. The Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B. General Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        1. Findings on Pars' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        2. Findings on Unilever's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V. Follow Up

    A. Freezer and Rental Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B. Attorney Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I. Introduction

A. Nature of Dispute and Parties

This is a commercial dispute between an ice cream manufacturer and one of its distributors. Plaintiff, Pars Ice Cream Company, Inc., a Michigan corporation (Pars Michigan), and Pars Ice Cream California, Inc., a Michigan corporation (Pars California),[1] are suing Conopco, Inc., d/b/a Unilever (Unilever), claiming breach of distribution agreements between them. Unilever is counter-claiming for unpaid obligations under the agreements. Unilever is also suing Davoud Sadeghi (Sadeghi) and Shelley Traywick (Traywick), owners of the Pars' companies on personal guarantees. Traywick has been dismissed from the case on summary judgment (Doc. 163).

The various disputes between the parties were tried to the Court in January, 2016, extending over 13 days. This decision reflects the findings and conclusions of the Court under Fed. R. Civ. P. 52. As will be explained, Pars Michigan and Pars California are indebted to Unilever for unpaid obligations under the agreements in the aggregate amount of $2,464,780.29. Pars' claims of breach of contract and tortious interference with business relationship have no merit. What remains to be resolved are certain ice cream freezer issues, for unpaid rent and unreturned freezers, as will also be explained.

B. Prior Litigation

This is the third lawsuit between Pars Michigan and Unilever in this District. In 2008, and again in 2009, Pars Michigan sued Unilever after Unilever suspended

---

[1] Unless otherwise noted no distinction is to be made between the two (2) companies.

1

delivery of ice cream product because Pars Michigan and Pars California exceeded their credit limits by failing to timely pay invoices for ice cream product.  Each case was quickly settled by the agreement to pay outstanding invoices according to an agreed-upon schedule.  Each case was dismissed before an answer was filed.  The cases are:

*Pars Ice Cream Company, Inc. v. Conopco, Inc., d/b/a Unilever*
Case No. 08-13545
Filed 08-15-2008

*Pars Ice Cream Company, Inc. v. Conopco, Inc., d/b/a Unilever*
Case No. 09-10688
Filed 2-24-2009

C.  Prior Orders

Significant prior orders in the case are:

1. Order of Consolidation (Doc. 45).

   This order consolidated this case and a case filed in the Southern District of New York following the filing of this case and transferred to this district.

2. Order of Trifurcation (Doc. 122).

   This order set a sequence of trials: Unilever's liability to Pars; Pars' liability to Unilever; and then damages, if any.[2]

3. Order Granting Unilever's Partial Motion for Summary Judgment (Doc. 134) on its Account Stated Claim, Enforcing the Personal Guarantee of Davoud Sadeghi, and Appointing a Special Master on Freezers (Doc. 151).

   This order granted a partial summary judgment to Unilever on it's account stated claims and the personal guarantee of Sadeghi.  It

---

[2] The order of trials has not been observed.

appointed a special master on freezer issues. The judgments were for $296,585.32 against Pars Michigan and $418,751.02 against Pars California. The order also held Sadeghi personally liable on the monies owed by the two (2) companies. A formal judgment was never entered.

4. Order Adopting Recommendations of Special Master (Doc. 162).

This order related to an accounting for freezers, and did not resolve the money issues. See Part IV(A) below.

5. Order Granting Shelley Traywick's Motion for Partial Summary Judgment (Doc. 163).

This order dismissed the claim against Traywick on her personal guarantee. Traywick is Sadeghi's wife.

II. The Claims

A. Pars

The Pars Companies filed suit in December, 2012. In the Second Amended Complaint (Doc. 114), the counts are captioned as follows:

| | |
|---|---|
| Count I | Pars Michigan's Breach of Contract Claim (Failure to Supply Goods) |
| Count II | Pars Michigan's Breach of Contract Claim (Violation of Exclusivity Provision) |
| Count III | Pars Michigan and Pars California's Breach of Contract Claim (Improper Imposition of Freezer Rental Fees) |
| Count IV | Pars Michigan and Pars California's Breach of Contract Claim (Improper Imposition of Lost/Missing Freezer Fees) |
| Count V | Pars Michigan and Pars California's Breach of Contract Claim (Refusal to Recognize Proper Rebates and Other |

|  |  |
|---|---|
|  | Deductions) |
| Count VI | Pars Michigan's Tortious Interference With Business Relations and/or Tortious Interference With Business Opportunities and Advantages |
| Count VII | Declaratory Judgment Pursuant to 28 U.S.C. §2201 |
| Count VIII | Declaratory Judgment Pursuant to 28 U.S.C. §2201 (Improper Imposition of Fees for Loss/Missing Freezers) |
| Count IX | Pars California's Breach of Contract Claim (Failure to Supply Goods) |
| Count X | Pars California's Breach of Contract Claim (Violation of Exclusivity Provision) |
| Count XI | Pars California's Tortious Interference With Business Relations and/or Tortious Interference With Business Opportunities and Advantages) |
| Count XII | Pars Michigan's Breach of Contract Claim (Breach of the Freezer Agreement) |
| Count XIII | Liability for Pars Attorney's Fees and Costs |
| Count XIV | Pars Michigan and Pars California Breach of Contract Claim (Violation of Confidentiality Provisions) |

### B.  Counter-Claim

Unilever counter-claimed and filed a third party complaint (Doc. 116) naming Pars Michigan, Pars California, Sadeghi and Traywick as defendants.  The counts are captioned as follows:

| Count I | Breach of Contract - Distribution and Support Agreements |
|---|---|
| Count II | Breach of Contract - Freezer Agreements |
| Count III | Liability for Attorney Fees and Costs - Pars Michigan |
| Count IV | Breach of Written Agreement/Liability on The Personal Guaranty |

    Count V        Liability for Attorney Fees and Costs - Davoud Sadeghi and Shelley Traywick

    Count VI       Liability for California Judgment - Pars Michigan

    Count VII      Fraudulent Transfer

### C. New York Case

Following the filing of the complaint, Unilever filed suit in the Southern District of New York on February 13, 2013, naming as defendants Pars Michigan, Pars California, Davoud Sadeghi and Shelley Traywick (Civil Action No. 13-CV-1083). The case was transferred to this district and consolidated with this case (Doc. 25). The counts are captioned as follows:

    Count I        Breach of Contract - Distribution and Support Agreements

    Count II       Breach of Contract - Freezer Agreements

    Count III      Liability for Attorney Fees and Costs - Pars Michigan

    Count IV      Breach of Written Agreement/Liability on The Personal Guaranty

    Count V        Liability for Attorney Fees and Costs - Davoud Sadeghi and Shelley Traywick

    Count VI       Liability for California Judgment - Pars Michigan

### D. Observation

The several complaints are grossly excessive, a phenomenon reflected throughout this case.

III. Trial

A. Witnesses

Thirteen (13) witnesses testified; ten (10) in person and three (3) by deposition. A substantial majority of the witnesses were Unilever employees. These employees mostly were called by Pars. Pars relied for the most part on the testimony of Sadeghi to make out its case.

The witnesses were:

- **Richard Barno** — Barno was a sales manager for Pars. He was not directly involved in the Pars-Unilever relationship.

- **Keith Bartholomew** — Bartholomew was a customer of Pars. He operated a retail mobile ice cream business. He was not involved in the Pars-Unilever relationship.

- **Javier Echevarria** — Echevarria was the director of Unilever's Out-of-Home division in the later stages of the Pars-Unilever relationship. He made the decision not to renew Pars' agreements with Unilever.

- **Robert Kleifgen** — Kleifgen was director of Unilever's Out-of-Home division for most of the Pars-Unilever relationship. He testified by deposition.

- **Brian Lawrence** — Lawrence was an ice cream distributor in Grand Rapids, Michigan. He testified as to the ice cream business in general. He was not involved in the Pars-Unilever relationship.

- **Jerome Melzer** — Melzer was a Unilever regional business manager in the Out-of-Home division and involved in the Pars-Unilever business relationship. He testified by deposition.

- **Lucio Saldana** — Saldana managed Pars California.

6

- **Michael Schuckman**  Schuckman was a Unilever regional business manager in the Out-of-Home division and involved in the Pars-Unilever business relationship.

- **Bruce Shoecraft**  Shoecraft was a vice president of Unilever's Out-of-Home division and involved in the Pars-Unilever business relationship.

- **George Simpson**  Simpson was a Unilever credit manager. He handled the Pars account. When Pars exceeded its credit limit, he ordered shipments to Pars suspended. His authorization to suspend shipments could not be overruled by anyone except the president of Unilever.

- **Davoud Sadeghi**  Sadeghi was the owner of Pars and manager of Pars.

- **Stephen Cox**  Cox was a Unilever employee primarily involved in the freezer rental business of Unilever. He testified by deposition.

- **Andrew Lackman**  Lackman was a regional business manager of Unilever's Out-of-Home division, customer development group.

- **Michael Gardner**  Gardner was the area director of sales of Unilever's east United States Out-of-Home division, customer development group.

B. Exhibits

1.

A multitude of exhibits were offered into evidence. They included charts, review of financial statements, e-mails, agreements, letters, order invoices, product exemplars and the like.

2.

Significant exhibits, noting those attached, are as follows:

- DX 9        Pars' Preferred Distribution Agreement - Michigan

- DX 38          Pars' Mobile Vending Distribution Agreements - California and Arizona

- DX 4           Personal Guarantee

- DX 407         Termination Letter

- DX 523         Graph - History of Agreements (Exhibit A, attached)

- DX 6           Initial Credit Terms (Exhibit B, attached)

- DX 530         Graph - Pars' Weighted Days Taken to Issue Payments to Unilever (Exhibit C, attached)

- DX 535         Graph - Pars Michigan UIC Purchases of Pars' Weighted Days to Pay Invoices (Exhibit D, attached)

- DX 545         Fill Rates for Unilever Products Ordered by Pars and Similarly Sized Distributors, 2011 and 2012 (Exhibit E, attached)

- DX 283         Exemplar of Pars' unauthorized deduction (Exhibit F, attached)

- DX 197-2       Glossary of Terms Used (Exhibit G, attached)

- DX 355         Amended Judgment Awarding Attorney Fees to Cross-Defendant Conopco, Inc., d/b/a Unilever Ice Cream (Exhibit H, attached)

- DX 407         Letter of December 28, 2012 - Expiration of Agreement (Exhibit I, attached)

Also attached are:

- Tabulation of Unauthorized Freezer Deductions of $759,417.05 (Exhibit J)

- Tabulation of Unauthorized Sales Deductions of $522,965.74 (Exhibit K)

IV. Findings of Fact and Conclusions of Law

A. The Law

The law is governing the various claims follows. As to the parties' breach of contract claims, each must prove that a contract existed, that there was a material breach, and that breach caused damages. Mazzola v. Roomster Corp., 849 F. Supp.

2d 395, 402 (S.D.N.Y. 2012).  A material breach of a contract "go[es] to the root of the agreement between the parties," and "is so substantial that it defeats the object of the parties in making the contract."  Felix Frank Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir.1997).

To prevail on a claim for tortious interference with business relations claim, a party must have produced evidence of the existence of contracts with its sub-distributors or proof of legitimate business expectancies and show that the other party intentionally procured a breach of those agreements/expectancies without justification.  See Oddo Asset Mgmt. v. Barclays Bank PLC, 973 N.E.2d 735, 742 reargument denied, 979 N.E.2d 801 (N.Y. 2012).

### B.  General Findings

1. Pars Michigan was organized in 1988.  Pars Michigan distributes ice cream product in Southeastern Michigan.  Pars California was organized in 2005.  Pars California distributed ice cream product in Southern California and Arizona.  Pars Michigan and Pars California have a common ownership.  Sadeghi is the owner of both companies.

2. Unilever is a major manufacturer of ice cream products worldwide.  In the United States it manufactures a variety of name brand ice cream products, such as Good Humor, Breyers, Klondike, Ben & Jerry's and others.

3. Unilever and Pars Michigan began doing business in 2005, after Unilever acquired a company that manufactured Good Humor products.  Pars Michigan was a distributor of Good Humor products at this time.

4. Unilever and Pars Michigan entered into a Preferred Distribution

Agreement dated October 01, 2005, which by its terms ended December 31, 2012. Under the agreement, Pars had the exclusive right to sell a limited number of Unilever ice cream products in a defined area of Southeastern Michigan through convenience stores, service stations, "Mom & Pop" stores and other retail locations with less than three (3) cash registers.  Certain other retail locations are designated in the agreement to which Pars had the right to sell ice cream product, as well as retail locations to which Pars had no right to sell ice cream product.

5.     At the time Pars began selling Unilever products, Pars was subject to credit limitations, as well as a requirement to pay invoices within thirty (30) days of the date issued.

6.     When Pars California began selling Unilever products, the agreement between Unilever and Pars had limitations and requirements similar to those in the Pars Michigan agreement, except that the retail locations were more restricted.  In California, Pars took over from a California distributor who contested the Unilever-Pars agreement.

7.     During the course of their relationship, Pars received trade allowances from Unilever in the form of pricing and rebates.  These trade allowances were negotiated between the parties with the final decisions made by Unilever.

8.     The relationship between the parties from the beginning was contentious. Pars frequently accused Unilever of violating its exclusivity rights, shorting it on product, failing to reasonably negotiate on trade allowances and the like.  Unilever in turn frequently charged Pars with unilaterally taking credits against purchase obligations to which it was not entitled, not paying invoices in a timely fashion and otherwise not fulfilling its obligations under the agreements.

9. Unilever and Pars, as part of their business relationships, had an ice cream freezer rental agreement which involved a contentious relationship with regard to accounting for freezers and freezer rental payments.

10. Delivery to Pars of the ice cream product it ordered was under the control of the credit department of Unilever. When Pars' unpaid invoices exceeded its credit limits, Unilever's credit department put a hold on deliveries. Unilever's sales department could not override a hold.

11. At least three (3) times during their relationships, delivery of product by Unilever to Pars was suspended because Pars fell behind in payments, and the outstanding amount due Unilever exceeded Pars' credit limitations. In 2008, the suspension of deliveries triggered a lawsuit by Pars. In 2009, a second lawsuit was triggered by suspension of deliveries. On each of these occasions, Unilever and Pars agreed to a schedule of payments which lifted the suspensions. Pars did not meet the agreed upon schedule of payments. In 2011 there was a third settlement agreement. Again, Pars defaulted on the agreed upon schedule of payments.

12. On December 28, 2012, Unilever, after full consideration of the Pars relationship, notified Pars it was not renewing the distribution agreements, and terminated Pars Michigan and Pars California as distributors.

13. Pars, in taking unauthorized freezer rent deductions of $759,417.05, and unauthorized sales deductions of $522,956.74, at termination of the agreements, it was indebted to Unilever in the amount of $1,282,373.79.

14. Pars was also indebted to Unilever in the amount of $296,585.32 and $418,751.02 on the partial summary judgment for unpaid product invoices, for a total of

$715,336.34.  Sadeghi was obligated to Unilever in a like amount on his guarantee.

15. Finally, Pars was also indebted to Unilever in the amount of $467,070.48 for the unpaid California judgment.

### B. Findings on Pars' Claims

1. Pars says Unilever's actions were intended to destroy Pars by refusing to adequately supply Pars ice cream product, holding up deliveries, selling to other distributors in its exclusive territory, arbitrarily lowering its credit limits and arbitrarily refusing to give it trade support payments and credits, as well as improperly charging it freezer rents.  The record does not support any of these assertions.

2. In large measure Pars relies on the testimony of Sadeghi to establish its claims.  There is no documentary evidence to support these claims.  Sadeghi was not credible.  His testimony was highly imaginative.  Much of his testimony on direct examination was inconsistent with his testimony on cross-examination.  The best example of inconsistent statements was Sadeghi's assertion that at the beginning of Pars California sales in Southern California, Unilever shipped Pars California $2 Million Dollars of ice cream product which it did not order.  On cross-examination, Unilever conclusively established such was not the case.  Rather, the $2 Million Dollars of product was shipped to Pars over a period of time, and was ice cream product which was part of Pars' opening inventory.  Special credit limits were established for this ice cream product, and it appears from the record that Pars paid the invoices over time.  There was nothing unusual or oppressive in the manner in which Unilever shipped the ice cream product which was part of the $2 Million Dollars overall.

3. The record does not support Pars' claim that Unilever failed to supply

product ordered by Pars in a timely fashion. Unilever withheld product from Pars when Pars' credit was on hold, i.e., Pars' indebtedness to Unilever exceeded Pars' credit limitation.

4. The record does not support a denial of ice cream product to Pars when product was in a short supply. Pars received its fair share of ice cream product when there were unforeseen shortages in the geographical areas in which Pars operated.

5. The record does not support the claim that Unilever was not fair with its trade allowances, either by payments or rebates to which Pars was entitled, when Pars presented proper documentation. The deductions taken by Pars from unpaid invoices in the form of credits were not allowable. Pars relied on Sadeghi's testimony to establish its right to such credits. Deductions from an invoice for a trade support credit were not authorized; likewise, a deduction for an anticipated trade support credit was also not authorized.

6. Unilever did not sell ice cream product to other distributors in violation of the distribution agreements. The record does not establish proof of such sales. There was no evidence of sales by Unilever to Prairie Farms, Bareman, Dean Foods or others with the expectation or knowledge that these distributors would sell product to retailers in violation of Pars' exclusivity rights. The post-trial submission by Pars in support of this claim lacked an explanation of how Pars' sales were adversely affected by improper conduct on the part of Unilever. Illegal sales were not identified. There was nothing in these submissions by Pars to show that sales to these distributors were in violation of Pars' territorial or product rights.

C. Findings on Unilever's Claims

1. Pars, throughout its relationship with Unilever, frequently took unilateral action with regard to what it considered credits on invoices for product.

2. Termination of Pars was at the direction of Echevarria, who was the recently appointed director of Unilever's Out-of-Home Division. He made his decision after a detailed review of the relationship, and based on his view that Pars, while a reasonably successful distributor, caused Unilever more problems than the profit it earned from the relationship was worth.

3. Exemplary of the difficulty Unilever had with Pars is reflected in DX 34, a Credit Review of Pars Michigan in March, 2007.

4. Unilever is entitled to a money judgment based on Pars' failures as reflected in this decision.

## V. Follow Up

### A. Freezer Rental Program

As part of their relationship, Unilever and Pars had an ice cream freezer rental agreement under which Unilever rented ice cream freezers to Pars. Pars paid Unilever for the freezers at a fixed monthly rent. Pars in turn placed the freezers in the retail locations to which it sold Unilever product. Pars was responsible for maintenance of the freezers.

The freezers were slide-top and open door. The freezers were a point-of-sale product, i.e., customers of the retail locations would pick from a freezer ice cream items to be consumed on site or taken out. Several thousand freezers were in the program. There were monthly accountings between Unilever and Pars for placement, removal, obsolescence and repair. At the termination of the distribution agreements, the freezers

were to be returned by Pars to Unilever.

The freezer relationship between Unilever and Pars became contentious because of record keeping deficiencies on the part of each party and other factors. Pars frequently fell behind in rental payments, as well as accounting for lost and defective freezers. A good deal of trial time and numerous exhibits were devoted to freezer accounting. Three (3) of Unilever's affirmative claims, as well as certain Pars' claims and denials are directed to the freezer matter.

There is no real dispute over the fact that

- Pars took unauthorized freezer rental deductions of $759,417.05 as a credit against invoices for product.

There is a dispute, however, as to

- unpaid freezer rentals outside of the unauthorized freezer rental deductions
- the accounting for the return of freezers. The accounting includes the value of lost and missing freezers, as well as unreturned and lost freezers.
- In an effort to resolve the freezer issues prior to trial, the Court appointed a special master. A good deal of effort went into the special master's proceedings. These proceedings resulted in a report and recommendation of the special master.
- The report and recommendation also became a point of contention. Prior to trial Unilever filed a motion for a contempt finding against Pars and Sadeghi (Doc. 192) which remains unresolved. Additionally, a good deal of trial time was spent on these issues. These outstanding freezer issues can best be solved by a separate proceeding following the docketing of this Decision.

15

B.  Attorney Fees and Expenses

Attorney fees and expenses claimed by the parties will be considered and decided in a separate proceeding following the docketing of this decision, at the same time that the outstanding freezer issues are resolved.

VI.  Conclusion

A.

A judgment will enter against Pars and Sadeghi in the amount of $2,464,780.29, broken down as follows:

$715,336.34 for unpaid product invoices (per the partial summary judgment decision)

$522,956.42 for unauthorized sales deductions

$759,417.05 for unauthorized freezer deductions

$467,070.48 for the unpaid California judgment

Should the aggregate amount of the obligation of Pars to Unilever been improperly calculated, it can be corrected on motion.

B.

The judgment is a final judgment.  The freezer rental issue and the attorney fees and expenses issues are bifurcated.  The bifurcated issues are separate and distinct An appropriate order to that effect will be entered.  There is no just reason not to issue a final judgment.  The amount of the final judgment reflects essentially trade obligations.  Further delay in allowing Unilever to go forward with collection of this amount would be unjust.

C.

Unilever shall present to the Court within ten (10) days, and notice to Pars, a form of judgment to be entered to reflect this decision.

SO ORDERED.

CODA

When all is said and done, this decision rested on the documents, not testimony. The documents favored Unilever's position in all respects. The case calls to mind the following passage:

> Truth isn't in accounts, but in account books.

Josephine Tey, The Daughter of Time 104 (N.Y. Washington Square Press)

```
                                        S/Avern Cohn
                                        AVERN COHN
Dated: June 20, 2016                    UNITED STATES DISTRICT JUDGE
```

S:\WestKM\OPINIONS\June 2016\12-15598.Pars.Unilever.DECISION.wpd

17